FEDERAL ELECTION
COMMISSION, Plaintiff,

v.

NATIONAL REPUBLICAN SENATORI-
AL COMMITTEE and James L.
Hagen, Defendants.

Civ. A. No. 90–2055.

United States District Court,
District of Columbia.

April 9, 1991.

Lawrence M. Noble, Gen. Counsel, Richard B. Bader, Associate Gen. Counsel, David M. FitzGerald, Asst. Gen. Counsel, Franciszka A. Monarski, Atty., Federal Election Com'n, Washington, D.C., for plaintiff.

Thomas Kirby, Jan Witold Baran, Carol A. Laham, Washington, D.C., for defendants.

## MEMORANDUM

GESELL, District Judge.

This is a civil enforcement action brought by the Federal Election Commission ("FEC"). It presents questions of first impression concerning the meaning and effect of the Federal Election Campaign Act ("FECA"), 2 U.S.C. § 431 *et seq.* and related regulations which govern limitations on campaign donations by political committees, including those affiliated with national political parties. The case concerns a 1986 fundraising campaign conducted by the National Republican Senatorial Committee ("NRSC") to raise funds for twelve candidates to the United States Senate in which each potential donor was asked to write a check to the NRSC to be passed on in equal proportions to four of the twelve candidates. The parties are before the Court on cross-motions for summary judgment, which have been fully briefed and orally argued. The Court has jurisdiction pursuant to 28 U.S.C. § 1345.

## I. *Background: Proceedings Before the Commission*

The Complaint was filed as a result of this Court's decision in a prior case involving the same underlying facts, *Common Cause v. Federal Election Commission*, 729 F.Supp. 148 (D.D.C.1990). It is appropriate, therefore, briefly to outline the context in which the present action arises before turning to the facts and issues now before the Court.

On October 28, 1986, an organization, Common Cause, filed a complaint with the FEC alleging that a 1986 fundraising solicitation undertaken by NRSC violated FECA. On April 9, 1987, the Commission unanimously indicated it had reason to believe that NRSC had violated various provisions of FECA in connection with the 1986 solicitation, as Common Cause had alleged. After taking briefs from NRSC and further investigation by its General Counsel, on July 26, 1988, the Commission found probable cause as to all but one of the charges raised by Common Cause and adopted by the General Counsel. On December 23, 1988, FEC voted to accept a conciliation agreement with NRSC. The conciliation agreement contained findings as to all of the violations for which the FEC found probable cause and required NRSC to pay a $20,000 civil penalty.

The issue now before this Court is the one charge raised by Common Cause and the FEC General Counsel on which the Commission did *not* find probable cause in its July 1988 vote. The General Counsel, arguing that NRSC, in its 1986 fundraising solicitation, exercised "direction or control" over the choice of recipient candidates within the meaning of 11 CFR section 110.-6(d)(2), sought a probable cause order alleging that NRSC's failure to report these funds as contributions from itself to the candidates violated both the reporting requirements, 2 U.S.C. § 434(b), and contribution limits, 2 U.S.C. § 441a(h), mandated by

statute. The Commission, however, deadlocked 3–3 on its General Counsel's recommendation, and therefore, pursuant to 2 U.S.C. section 437g(a)(4)(A)(i), which requires a majority vote for a probable cause finding, the recommendation was rejected.

After Common Cause was notified of the dismissal of this remaining claim, it filed suit in this Court on February 27, 1989, Civil Action No. 89–0524, seeking a review of the Commission's action. On consideration of cross-motions for summary judgment, this Court, on January 24, 1990, reversed FEC's partial dismissal of Common Cause's complaint and remanded to FEC with directions "to conform with this declaration and proceed accordingly within 30 days." 729 F.Supp. at 153.

This Court accepted both of Common Cause's alternative theories as to why there was probable cause to find additional violations: First, the contributions from the NRSC solicitation were not "earmarked" within the meaning of FECA and thus should be considered contributions from NRSC to the candidates, and second, as the FEC General Counsel also had previously urged, even if the contributions had been adequately earmarked, NRSC had exercised "direction or control" over the choice of recipients and, accordingly, should be charged with direct contributions pursuant to 11 CFR § 110.6(d)(2). FEC did not appeal.[1]

▪ Thereafter, on February 15, 1990, FEC, by a vote of 5–0, found probable cause to believe that NRSC and its treasurer (a) violated 2 U.S.C. § 434(b) and 11 CFR § 110.6(d)(2) by failing to report as contributions from itself approximately $2,718,-813.60 in contributions forwarded in 1986 to twelve authorized committees of candidates for the United States Senate, and (b) violated 2 U.S.C. § 441a(h) by exceeding the $17,500 limitation set therein for contri-

---

1. NRSC sought to intervene in the *Common Cause* case, but only after seven months had passed since the Court's January 24 Order resolving the case. NRSC's motion to intervene was mooted when a post-decision dispute between Common Cause and FEC over enforcement of the judgment was itself mooted. NRSC has appealed this Court's decision declaring its motion to intervene moot. On October 23, 1990, this Court denied defendants' motion herein to stay this case pending NRSC's appeal in the *Common Cause* case.

butions to individual Senate campaigns by a total of $2,676,916.[2]

On August 21, 1990, the Commission voted to initiate the instant action, which was filed three days later. Although the Complaint reaffirmed the allegation that both the contribution and the reporting violations amounted to approximately $2.7 million, for summary judgment purposes FEC limits its claim as to each alleged violation to about $2.3 million.[3]

## II. *Facts*

There are no genuine issues of material fact herein.

NRSC is a political committee registered with the FEC under FECA. It is devoted to the election of Republican candidates to the United States Senate. Defendant James L. Hagen is the present treasurer of the NRSC, although he was not the NRSC treasurer at the time of the 1986 solicitation that is the subject of this suit.

On or about September 2, 1986, the NRSC mass-mailed a solicitation for contributions utilizing the letterhead and signature of then-Vice President George Bush. The letter generally warned that the Republican Party was at risk of losing majority control of the Senate. The NRSC sent out 24 different versions of the letter, each mentioning four states in which U.S. Senate campaigns were occurring in 1986 and where the Republican candidates were "on the verge of running out of money." The letter did not mention the names of the Republican candidates in those states. In total, twelve different Senate campaigns were mentioned in the 24 versions of the letter, although some campaigns were mentioned in more letters than other campaigns. A copy of a typical letter and the accompanying reply form is attached as Appendix 1 to this Memorandum.

Each solicitation letter requested that the recipient contribute a specific, generally small amount and make his or her check payable to the NRSC or to entities such as the "Inner Circle" and the "Republican Presidential Task Force," entities that NRSC identifies in its motion papers as "names utilized by the NRSC for fundraising purposes." NRSC or the named entity, according to the letter, would then "see to it that every penny of your generous contribution is evenly split and immediately delivered to each of these four candidates."

The different versions of the solicitation letters were sent to different mailing lists and requested different amounts of money, depending on prior donor history. Of the 565,217 letters sent, 289,081 were sent to persons who had never previously contributed to NRSC.

The states mentioned in the NRSC mailings were Alabama, Arkansas, California, Colorado, Florida, Georgia, Louisiana, Missouri, Nevada, North Carolina, South Dakota and Vermont.[4]

Each of the twelve campaigns mentioned in the letters signed an agreement with the NRSC agreeing to pay part of the cost of mailings mentioning its race. However, the reply card accompanying the letters stated, "PAID FOR AND AUTHORIZED BY THE NATIONAL REPUBLICAN SENATORIAL COMMITTEE," and did not

---

**2.** Three Commissioners eventually explained the February 15 vote in a four-page statement indicating that they felt bound by this Court's decision but that they "strongly resented" the decision and considered it "bad law," and that "[u]nless and until it is reviewed by a higher court, we consider [it] to now stand as simply the aberrant law of one case, unattached to Commission precedent and decisional authority." Statement of Reasons by Commissioners Aikens, Elliott, and Josefiak, Matter Under Review (MUR) 2282, December 10, 1990. In light of these views from three of the six Commissioners, it is clear that FEC is pursuing this case only as a result of this Court's decision, and, accordingly, no deference is owed or permitted

to FEC's judgments relating to specific issues in this case. However, general deference is still owed to existing duly-enacted FEC regulations.

**3.** Specifically, FEC claims that the undisputed facts show that NRSC exceeded its contribution limits by at least $2,306,615 and failed to report contributions totalling at least $2,340,664.

**4.** The Republican candidates in those states, respectively, were Jeremiah Denton, Asa Hutchinson, Ed Zschau, Kenneth Kramer, Paula Hawkins, Mack Mattingly, Henson Moore, Christopher Bond, James Santini, James Broyhill, James Abdnor and Richard Snelling.

state that the solicitation was authorized or paid for by any of the campaigns mentioned in the letters.

No candidate participated in the planning, approval, implementation or oversight of the NRSC solicitation program, nor did any candidate authorize or approve the content of the letters sent by the NRSC as part of that program.

The September 1986 mailings cost approximately $672,000. Of this amount, the NRSC billed the campaigns for the $62,909 cost of the mailings that did produce a donation, but did not pass on the $610,891 cost of the mailings that did not produce a donation.

About 8.5 percent of those solicited—43,371 persons—sent checks to NRSC in response to the solicitation. The checks totalled $2,340,664. The Court has found in the record requests for contributions as small as $15 (and as large as $1000) and actual returns as small as $5 (i.e. $1.25 per candidate). The funds received were first deposited in NRSC bank accounts and then disbursed by the NRSC to the various campaigns within 10 days of receipt.

The NRSC did not report the contributions to the FEC either as contributions to it by the individual donors or as contributions by it to the twelve campaigns. Rather, each of the twelve campaigns reported the individual contribution of each donor as having been made directly by the donor to the campaign.[5]

### III. *Questions presented*

FEC contends that NRSC must be charged with making the contributions to the twelve campaigns because NRSC exercised "direction or control" over the choice of recipients. NRSC attacks this claim on several grounds. It contends (1) that it did not exercise "direction or control" within the meaning of the regulation; (2) that the "direction or control" regulation is inconsistent with FECA; and (3) that the "direction or control" regulation, at least as applied to it, is inconsistent with the First Amendment of the Constitution. Because, for reasons stated below, the Court sustains FEC's position, it must also determine the appropriate civil penalty.

### IV. *Legal analysis*

The NRSC is a political committee within the meaning of 2 U.S.C. § 431(4), and therefore is required by 2 U.S.C. § 434(b) to file accurate periodic reports with the FEC regarding its expenditures and contributions. While FECA limits most multi-candidate political committees to $5000 in contributions to a political candidate per election, 2 U.S.C. § 441a(a)(2)(A), NRSC, along with its Democratic Party counterpart, are permitted a higher limit—$17,500 per Senate candidate during an election year. 2 U.S.C. § 441a(h). In 1986, the NRSC was the designated agent of the Republican National Committee and therefore under 2 U.S.C. § 441a(d)(3) was also entitled to make a contribution to each U.S. Senate candidate equal to the greater of (a) $20,000, or (b) two cents multiplied by the

---

**5.** In connection with some contributions received as a result of the 1986 solicitation, NRSC determined that the contributors affirmatively intended to earmark the funds so contributed to the NRSC itself, and the NRSC accounted for these funds as contributions to it. However, for $108,086 in funds later determined by the FEC General Counsel to have been earmarked for the NRSC, the NRSC did not account for the funds as contributions to it and, instead, treated the checks as earmarked for specific candidates and forwarded the contributions to those candidates.

This conduct led to one of the July 1988 probable cause findings by the Commission, i.e. that the NRSC violated 2 U.S.C. § 434(b) by failing to report as contributions from itself $108,086 in *contributions earmarked for the* NRSC but forwarded to six of the twelve Senate campaign committees. The other charges on which the Commission found probable cause in July 1988 were (1) that the NRSC violated 2 U.S.C. § 434(b) by failing to report as contributions to the twelve campaigns $608,568 in costs related to unsuccessful solicitations; (2) that the NRSC violated 2 U.S.C. § 441a(h) by exceeding the statutory $17,500 limitation on contributions to the twelve campaigns by a total of $534,249.25; and (3) that the NRSC violated 2 U.S.C. § 441d(a)(1) by failing to clearly state in the solicitation package the names of certain entities, i.e. the individual campaigns, who had authorized and paid for it. These were the matters ultimately conciliated by FEC and NRSC in December 1988.

voting age population of the state in which the Senate candidate was running.[6]

### A. Direction or control

FEC rests its summary judgment argument on its claim that NRSC exercised some "direction or control" over the contributions at issue, that NRSC is therefore chargeable with those contributions and that, accordingly, NRSC exceeded the contribution limits and failed to comply with the reporting requirements set out above. FEC refuses to concede its alternative theory, premised on this Court's *Common Cause* finding, *see* 729 F.Supp. at 152, that the contributions at issue were not "earmarked," but it argues that this alternative theory is unnecessary and, because of potential disputed issues of fact, problematic on the present summary judgment record. Because FEC has not presented evidence or argument regarding "earmarking," the Court treats that theory as conceded and proceeds to consider the "direction or control" aspect of the case.[7]

Section 110.6(d) of 11 CFR provides that, if a person or entity acts as a conduit for a contribution made by another person and "earmarked" for a specific candidate or candidates, the contribution limits of the conduit are not affected by passing on the contribution to the candidate, except where the conduit exercises "any direction or control over the choice of the recipient candi-

date," in which case the contribution is charged against the contribution limits of both the original donor and the conduit.[8]

■ NRSC contends that it was a mere conduit exercising no "direction or control" because potential donors were informed that the individual donations would be divided evenly among the four Senate candidates in the states mentioned in the letter and the donations were in fact distributed in accordance with that formula.

However, with respect to the contributions at issue in this case, the Court finds that NRSC did exercise some "direction or control over the choice of the recipient candidate" within the meaning of 11 C.F.R. § 110.6(d). Although the September 1986 letter apprised each donor of the formula for distribution, and donors gave voluntarily, NRSC's direction and control over the recipients of the monies is evident.

"Direction" means "management, supervision, or guidance of some action or operation." *American Heritage Dictionary of the English Language* 373 (1981). "Control" means "authority or ability to regulate, direct, or dominate." *Id.* at 290.

The NRSC, and not the candidates, chose how many letters in which each campaign would be mentioned and which candidates would be bundled in the same letter. The NRSC, and not the candidates, chose which mailing lists, with which donation histories,

---

**6.** Such agency activity by NRSC has been explicitly approved by the Supreme Court. *See FEC v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981).

**7.** Section 110.6(b) of 11 CFR provides that a contribution is "earmarked" if it is subject to a designation, instruction or encumbrance which results in all or any part of that contribution being made to "a clearly identified candidate or a candidate's authorized committee." The statutory definition of "clearly identified" is: (A) the name of the candidate involved appears; (B) a photograph or drawing of the candidate appears; *or* (C) "the identity of the candidate is apparent by unambiguous reference." 2 U.S.C. § 431(18).

The Senate candidates involved here were not named or depicted in the September 1986 letter, and although the references to them therein were probably unambiguous, *see Buckley v. Valeo,* 424 U.S. 1, 43 n. 51, 96 S.Ct. 612, 646 n. 51,

46 L.Ed.2d 659 (1976), the question remains as to whether their identities were "apparent." Record evidence in *Common Cause* (not addressed by the parties herein) suggested that individual donors had often never even heard of the candidates to whom they had supposedly contributed and that some of those donors actually intended to give to the NRSC for use in its discretion. This evidence was sufficient to compel the Court in *Common Cause* to determine that FEC should have found probable cause with respect to the earmarking issue.

**8.** The version of the "direction or control" regulation now in effect at 11 CFR § 110.6(d) differs from the version in effect, *see* 41 Fed.Reg. 35948 (1976), at the time NRSC mailed the Bush letter, but not in any respect directly relevant to this dispute. The current version of the regulation was published as a proposed rule prior to the September 1986 distribution of the Bush letter. *See* 51 Fed.Reg. 27192 (July 30, 1986).

would be used for each version of the letter.

Potential donors were given a single donation option if they wished to respond to the Vice President's request for funds: to write checks to NRSC for equal distribution to the four preselected candidates. A precise amount was requested. While donors were not told they were required to contribute according to the formula, there was no suggestion that they could do otherwise if they wished to contribute. At the very least, the letters created a default mechanism that established "direction or control" over the identities of candidates who would benefit from unencumbered responses and the formula for division of contributions.

At the same time, importantly, the identities of the candidates who would benefit were obscured. The September 1986 letters referred only vaguely to candidates in four states without giving potential donors any information about those candidates, including even their names. The letter focused on the dangers—for President Reagan, Vice President Bush, and the potential donor—of losing Republican control of the Senate. The contributions were to be made to NRSC or an entity controlled by NRSC, rather than to the candidates, and the disclaimer on the return card indicated, incorrectly, that the mailing was authorized and financed by NRSC only, with no involvement of the campaigns.

In sum, it is clear from the face of the solicitation package that the fundraisers hoped to raise funds for candidates for whom donors might have little specific enthusiasm by blurring the specific funding requests in a general pro-party message. While NRSC argues that their appeal was targeted at sophisticated, longtime party regulars, amounts sought were as small as $15, actual donations were as small as $5, and more than half of those solicited had never before given to NRSC.[9]

Once the checks were received, NRSC deposited them in its own account. Although NRSC apparently considered itself bound by law to pass the checks on to the four named candidates in equal parts within ten days (*see* 11 CFR § 110.6(b)(2)(iii)), that supposed legal obligation was not made clear in the fundraising letter, which stated, referring to NRSC, that "they'll see to it" that the contribution would be split evenly among the four candidates. This statement could be interpreted in various ways—perhaps as a contractual commitment backed by statute but also, alternatively, as a simple promise or even a prediction. It appears that the fundraisers did not mind attracting donors who did not care at all which candidates would receive the money but simply wanted to help the President and Vice President keep control of the Senate however they could.

Because NRSC exercised some "direction or control" over the choice of recipients of funds from its September 1986 solicitation in the manner explained above, it would appear that the monies obtained as a result must be deemed contributions from NRSC to the twelve candidates pursuant to 11 C.F.R. § 110.6(d), chargeable against NRSC's statutory contribution limits and subject to the statutory reporting requirements. Defendants, however, have launched a broad attack on the "direction or control" provision on its face and as applied to them.

### B. Defendants' statutory argument

■ Defendants' first approach is statutory. They charge that the "direction or control" provision of the regulations is inconsistent with and not authorized by FECA. However, the Court concludes that the regulation is consistent with the language and purpose of the statute. Section 441a(a)(8) of 2 United States Code requires that for purposes of FECA's contribution limits

all contributions made by a person, either directly or indirectly, on behalf of a par-

---

**9.** Specific accounts of donor confusion as to where their money was going is part of the record on summary judgment, *see* Plaintiff's Exhibit 1 to Memorandum of November 19, 1990,

and although FEC does not point to those accounts as evidence for purposes of its motion, the accounts do tend to suggest the confusing aspects of the solicitation.

ticular candidate, including contributions which are in any way earmarked or otherwise directed through an intermediary or conduit to such candidate, shall be treated as contributions from such person to such candidate.

The House committee report indicates that, in addition to the limitation directly indicated by this provision, Congress intended that under some circumstances contributions through a conduit would be treated as contributions from the conduit as well as from the original contributor:

It is the understanding of the committee that the following rule will apply with respect to the application of the contribution limitations established by [current section 441a]: if a person exercises any direct or indirect control over the making of a contribution, then such contribution shall count toward the limitation imposed with respect to such person under [current section 441a], but it will not count toward such a person's contribution limitation when it is demonstrated that such a person exercised no direct or indirect control over the making of the contribution involved.

H.R.Rep. No. 93–1239, 93d Cong., 2d Sess. 16 (1974) U.S.Code Cong. & Admin.News 1974, p. 5587. The House version of the bill was adopted by the conference in relevant part, and the Conference Report repeats the quoted language as constituting the House Committee's understanding. *See* H.R.Rep. No. 1438, 93d Cong., 2d Sess. 51, 52 (1974); 51 Fed.Reg. 27189. The intent expressed is apparent: An entity must not be permitted to circumvent its statutory contribution limits by means of contributions obtained from others. In implementing that aim, FEC's "direction or control" regulation seeks to define those circumstances under which a contribution through a conduit must be treated as a contribution by the conduit. FEC, in enacting the "direction or control" regulation, adopted the approach suggested by the House committee. The regulation is a reasonable construction of the statute and thus valid under *Chevron USA v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

C. Defendants' constitutional arguments

Defendants also argue that the "direction or control" provision imposes unconstitutional limitations on political speech.

■ It is settled that limitations on contributions to candidates are consistent with the First Amendment where they are narrowly tailored to serve compelling government interests. The primary government interest recognized by the courts with respect to FECA's contribution limits is the interest in preventing corruption or the appearance thereof in the political process. *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *FEC v. National Conservative Political Action Committee*, 470 U.S. 480, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985). This compelling interest applies to contributions from organizations, such as political committees, as well as individuals. *See FEC v. National Right to Work Committee*, 459 U.S. 197, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982).

■ FECA's reporting and disclosure requirements, too, serve the anti-corruption purpose as well as the substantial government interest in providing the public with information as to the origin of funding. *Buckley v. Valeo*, 424 U.S. at 66–68, 96 S.Ct. at 657–58.

■ The "direction or control" regulation is sufficiently tailored to address narrowly the government's anti-corruption and public information concerns. It imposes no new restrictions on political committee contributions. Rather it implements Congress' recognition, as stated in the committee reports, that contributions made in circumstances where the conduit exercises direct or indirect control are, for purposes of measuring influence, contributions from the political committee itself, not merely from the individual donor. Where, as here, the solicitation package only refers vaguely to the candidates involved, donors are asked to write checks directly to the political committee, and contributions are solicited and distributed in accordance with a formula

pre-determined by the committee, likely donors are those that are inspired by the message of the committee itself and its leaders and not necessarily by the perhaps obscure candidates who eventually receive the funds. In these conditions, the potential for accumulation of influence by the committee itself is present, although on paper the committee is presented as a mere conduit.

However, defendants in their reply brief emphasized still a new argument, that defendant NRSC, as a committee of a political party, is entitled to special consideration beyond that afforded other organizations in applying the Federal Election Campaign Act and that, accordingly, the "direction or control" regulation cannot constitutionally be applied to it. Defendants' argument is that the compelling government concern in preventing corruption or the appearance thereof is not present where the contributing organization is affiliated with the political party under whose banner the candidate is running and that, therefore, First Amendment concerns must prevail.

■ Defendants have not explicitly challenged the overall annual $17,500 limits on NRSC contributions to candidates, just the "direction and control" provision as a means to implement it. However, to ensure full consideration of defendants' claims, the Court must consider the constitutionality of both the statutory limit and the "direction and control" provision. The Court finds no constitutional violation.[10]

The comprehensive 1974 amendments to the Federal Election Campaign Act of 1971 for the first time set contribution limits for political committees; each committee was limited to a contribution of $5000 per candidate. In the wake of *Buckley v. Valeo*,

which generally upheld contribution limits, including the $5000 committee contribution limit, *see* 424 U.S. at 35–36, 96 S.Ct. at 642–43, but invalidated spending limits, Congress in 1976 was required to again make major changes in FECA. The Senate apparently took advantage of the need to revise the law by passing a revision bill that sought to exempt NRSC and its Democratic Party counterpart from the $5000 limit and establish a separate limit for those committees of $20,000 per Senate candidate. The version of the bill which was enacted into law retained the general Senate provision but reduced the amount permitted from $20,000 to $17,500. *See* H.R.Rep. No. 94–1057, 94th Cong., 2d Sess. 54, 59 (1976) U.S.Code Cong. & Admin. News 1976, pp. 929, 969, 974. Congress, then, in the wake of *Buckley v. Valeo*'s approval of spending limits, deliberately reexamined whether spending limits were appropriately applied to NRSC and determined that they were, although the limits were somewhat raised.[11]

The Supreme Court has cautioned against judicial overruling of congressional determinations as to when and where corruption can occur:

> [W]e accept Congress' judgment that it is the potential for such [corrupt] influence that demands regulation. Nor will we second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared.

*FEC v. National Right to Work Committee*, 459 U.S. at 210, 103 S.Ct. at 561.

It is entirely plausible that, as FEC counsel urges, application of campaign spending limits to the major political parties' own committees, including NRSC, serves the anti-corruption purposes identified by Con-

---

**10.** The Supreme Court has recognized the existence of spending limits imposed on the national parties and particularly their senatorial campaign committees, *see FEC v. Democratic Senatorial Campaign Committee, supra,* 454 U.S. at 40 n. 20, 102 S.Ct. at 46 n. 20, but apparently no federal judge has ever ruled on a direct challenge to these limits. Presumably this is because the national parties, having enacted the spending limits through bipartisan legislation, have not been inclined to try to upset them.

**11.** Thus the anti-corruption rationale for the contribution limits offered by Congress in 1974 and approved in *Buckley* is appropriately considered with respect to the $17,500 limit on NRSC spending, even though that limit was set by 1976 amendments. If the rationale justified the $5000 limit, it clearly applies to the less restrictive limit now in effect.

gress and approved by the Supreme Court in *Buckley*. The parties are not monolithic. There is a wide range of views among those candidates who choose to run as Republicans or Democrats. When it imposed the contribution limits, Congress' anti-corruption concern was not merely with the direct quid pro quo but also with the general appearance that elections were being decided by the influence of big money and not on the merits of the issues at the local level. *See* H.R.Rep. No. 93–1239, 93d Cong., 2d Sess. 3 (1974). The fact that candidate X is on the ballot in the Senate race in state X as a Republican or Democrat does not guarantee that he or she agrees with all the positions in the national party platform and, accordingly, may not eliminate the concern that the national party establishment will seek to "buy" the candidate's allegiance by means of campaign contributions from afar.[12]

■ Moreover, although members of partisan political organizations have free speech and free association rights with respect to organizational activities, *see Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 214, 107 S.Ct. 544, 548, 93 L.Ed.2d 514 (1986), political party committees do not have an exalted constitutional status that would automatically exempt them from limits imposed on other political committees; indeed the framers essentially declined to acknowledge in the Constitution itself the existence of political parties. The major parties, which have been subject to campaign limitations from their initial enactment, cannot expect their present special position in the political affairs of the country to justify different treatment under FECA. Accordingly, the spending limits approved by the Supreme Court as applied by Congress to party committees must be deemed constitutional.

If the overall $17,500 limits are constitutional, then so is the application of the "direction or control" provision, which is simply a means of preventing circumvention of that limit by certain conduit activities. Defendants claim that the only reason Congress capped party contributions was to prevent individuals from using party contributions to evade their individual contribution limits and that the "direction and control" provision is therefore unnecessary and unfair. That claim, however, is offered without any authority. Congress spoke of an anti-corruption goal, the Supreme Court approved that goal, and there is no indication in the record that Congress or the courts have ever stated that that goal does not apply to political party committees.

No fundamental speech or associational rights are abridged by the "direction or control" provision itself. Individuals and organizations remain free to contribute to candidates of their choice and through conduits of their choice so long as contribution limits are respected.

Nor is the "direction or control" regulation unconstitutionally vague or overbroad under applicable standards as articulated in *Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 578–79, 93 S.Ct. 2880, 2897, 37 L.Ed.2d 796 (1973) and *FEC v. National Right to Work Committee*, 459 U.S. 197, 211, 103 S.Ct. 552, 561, 74 L.Ed.2d 364 (1982). When the regulation was first published in 1976, FEC did not elaborate in the Federal Register on its rationale. *See* 41 Fed.Reg. 35950. However, by the time defendants sent the September 1986 letter, the FEC had proposed certain modifications to the regulation and in so doing, discussed in some detail on its conception of direction or control, with reference to its prior decisions. *See* 51 Fed.Reg. 27183, 27189 (July 30, 1986); FEC Advisory Opinion 1986–4, Fed. Elec. Camp. Fin. Guide (CCH) ¶ 5846; FEC General Counsel's Brief, Matter Under Review 1028, June 21, 1980 (Exhibit 3 to de-

---

**12.** The Court recognizes that the Supreme Court, in *FEC v. Democratic Senatorial Campaign Committee*, appeared to approve, at least as matter of logic, the notion that "effective use of party resources in support of party candidates may encourage candidate loyalty and re-

sponsiveness to the party." 454 U.S. at 42, 102 S.Ct. at 47. Nevertheless, Congress, by setting contribution limits from the parties to candidates has apparently concluded that too much responsiveness to the parties, if obtained by unrestricted contributions, is undesirable.

fendants' Memorandum of January 15, 1991, herein).[13]

Although greater detail in an area implicating the First Amendment is clearly desirable, FEC has explained the "direction or control" regulation with sufficient clarity and specificity, and the 1986 solicitation clearly demonstrated "direction or control" under the standard. "Direction or control," i.e. management and guidance of or ability to direct or dominate the choice of recipients of campaign funds was effected where NRSC devised the solicitation; matched subgroups of the twelve candidates with groups of donors; presented donors with a pre-selected division of contributions among pre-selected candidates in a pre-selected amount; did not identify the candidates by name; requested checks payable to NRSC and associated entities and not to the individual campaign committees; failed to inform donors, as required by law, that the individual campaign committees had authorized and helped pay for the mailings; and, in the fundraising letter, merged and confused the general needs of the Republican Party with the needs of the perhaps distant and obscure Senate candidates who eventually received the contributions.[14]

Accordingly, defendants' concern that the "direction or control" regulation chills fundraising "speech" is unwarranted, and defendants' First Amendment challenge is rejected.

**D. Conclusion on the merits**

■ The Court holds for purposes herein that NRSC and its treasurer (A) violated 2 U.S.C. § 434(b) and 11 CFR § 110.6(d)(2) by failing to report as contributions from itself more than $2.3 million in contributions forwarded in 1986 to twelve authorized committees of candidates for the United States Senate and (B) violated 2 U.S.C. § 441a(h) in 1986 by exceeding the $17,500 limitation on contributions to twelve authorized committees of candidates for the United States Senate by more than $2.3 million.[15]

The Court fully recognizes that these matters are not free from doubt. The FEC commissioners were evenly split on the applicability of the "direction or control" regulation. Congress' aim in limiting contributions by political party committees was not fully explicated, and the constitutional questions are somewhat novel. The Court's decision in *Common Cause* dealt only with probable cause, and no constitutional claims were raised. However, the Court has reexamined all of the issues previously raised and has carefully considered defendants' arguments. The Court concludes that the solicitation at issue was fundamentally inconsistent with the requirements and goals of the Federal Election Campaign Act.

**V. *Remedy***

The Court now turns to the remedy. Pursuant to 2 U.S.C. section 437g(a)(6)(B),

**13.** When the modifications became final (long after the September 1986 solicitation), FEC further elaborated on the regulation, although it declared itself "unable to formulate regulatory language that clearly delineates situations where direction or control exists." 54 Fed.Reg. 34,107–8 (1989).

**14.** As the FEC notes, 2 U.S.C. § 437f(a)(1) allows an interested party to obtain an advisory opinion from the FEC as to the legality of a particular fundraising or reporting approach. *See Martin Tractor Co. v. FEC,* 627 F.2d 375, 384–85 (D.C.Cir.), *cert. denied,* 449 U.S. 954, 101 S.Ct. 360, 66 L.Ed.2d 218 (1980). Although waiting for an advisory opinion from a sometimes-divided commission might seem unrealistic considering the ever-changing demands of political campaigning, FEC is required by statute to respond to a request for an advisory opinion within 60 days, or within 20 days if the request is

made within two months of an election, and NRSC, a sophisticated permanent organization with correspondingly sophisticated legal counsel, was and is well-equipped to avail itself of this procedure. However, advisory opinions are no substitute for clear rules where First Amendment activity is concerned.

**15.** Defendants have also made counterclaims, apparently described at paragraphs 34 and 35 of the Answer, which charge that FEC's prosecution of this case following remand by this Court is improper on both substantive and procedural grounds. The Court resolved the substance of the counterclaims in FEC's favor by its Memorandum and Order of November 29, 1990, denying defendants' Motion to Dismiss. Because defendants again pressed these claims at oral argument, the Court's November 29 opinion is attached as Appendix 2 and incorporated herein.

the court may remedy a violation of FECA by granting an injunction and/or awarding a civil penalty not exceeding the greater of $5000 or an amount equal to any contribution or expenditure involved for each violation. Here, given two violations each involving over $2.3 million, the penalty could exceed $4.6 million. Counsel for FEC seeks the maximum penalty.[16]

As indicated at the outset of this Memorandum, this is a matter of first impression. As is often the case, a federal court is called on to resolve statutory claims that create some uncertainty as to congressional intent. Here, also, the commission charged with administering the statute was divided over the meaning of its own regulation, making it impossible for the Court to adopt the agency's viewpoint by deference to its specialized experience. The vigor of the reactions both within the FEC and between counsel over the merits has left little guidance for the Court now that it appears that FEC is entitled to relief.

■■■■ Although the exposure is substantial, this is not an appropriate case to impose the maximum penalty FEC seeks.

The public interest was certainly harmed when a key affiliate of one of the major parties far exceeded its statutorily-prescribed contribution limits. The solicitation incorrectly informed donors and tended to undermine congressional policies, approved by the Supreme Court, underlying FECA by bringing outside money into local campaigns. Moreover, FEC's Exhibit 21 indicates that NRSC has the ability to pay a substantial monetary penalty, and FEC argues that a large penalty is required to effect deterrence.

However, the record discloses nothing that even suggests NRSC intentionally violated FECA. The campaign activities reviewed here were public and widely known. FEC suggests that NRSC's culpability is greater because it could have exercised its statutory right to obtain a prompt advisory opinion from the Commission, see footnote 14, supra, prior to its mailing. This point

is technically sound, but the exigencies of campaigning late in an election year make such a procedure dubious, and perhaps particularly so here where the Commission eventually deadlocked on this issue even after months of deliberation.

The significance of this case is that it may begin a process which will clarify the manner in which Congress intended to limit donations to candidates for office by political parties. In these circumstances, and considering all the relevant factors, see, e.g., FEC v. Furgatch, 869 F.2d 1256 (9th Cir.1989), the Court concludes that a penalty of $24,000 is appropriate.

FEC also seeks permanent injunctive relief, but an injunction is not necessary to prevent similar violations by defendants in the future. NRSC did not deliberately violate the law, and it is no doubt assisted at all significant stages of its fundraising activities by the advice of able counsel.

Plaintiff's Motion for Summary Judgment is granted on the merits except for plaintiff's request for imposition of the maximum statutory penalty and for an injunction. Defendant's Motion for Summary Judgment is denied. The Complaint and the Counterclaim are each dismissed.

An appropriate Order is attached.

### ORDER

Upon consideration of the cross-motions for summary judgment, the oppositions thereto, and the entire record herein, and there being no genuine issue of material fact, it is hereby

ORDERED that plaintiff's Motion for Summary Judgment is granted on the merits except for plaintiff's requests for imposition of the maximum statutory penalty and an injunction; and it is further

ORDERED that defendant's Motion for Summary Judgment is denied; and it is further

ORDERED that judgment is entered for the plaintiff; and it is further

---

**16.** Twice as severe penalties are permitted where a District Court finds a knowing and willful violation of the Act. See 2 U.S.C. section

437g(a)(6)(C). FEC does not press for these double penalties.

DECLARED that defendant National Republican Senatorial Committee (NRSC), by its September 1986 fundraising solicitation on behalf of twelve Republican candidates for the United States Senate, exercised "direction or control over the choice of the recipient candidate" within the meaning of 11 CFR 110.6(d), a regulation implementing the Federal Election Campaign Act, 2 U.S.C. § 431 *et seq.*, because NRSC devised the solicitation; matched subgroups of the twelve candidates with groups of donors; presented donors with a pre-selected division of contributions among pre-selected candidates; did not identify the candidates by name; requested checks payable to NRSC and associated entities and not to the individual campaign committees; failed to inform donors, as required by law, that the individual campaign committees had authorized and helped pay for the mailings; and merged and confused the general needs of the Republican Party with the needs of the individual Senate candidates; and it is further

DECLARED that, because NRSC exercised "direction or control" over the contributions, NRSC and its then-treasurer (A) violated 2 U.S.C. section 434(b) by failing to report as contributions from NRSC certain monies forwarded in 1986 to the twelve authorized Senate campaign committees; and (B) violated 2 U.S.C. § 441a(h) by exceeding the statutory limitation on NRSC contributions to the twelve authorized Senate campaign committees in 1986; and it is further

ORDERED that defendants shall pay a civil penalty of $24,000; and it is further

ORDERED that the Complaint and the Counterclaim are each dismissed.

APPENDIX 1

OFFICE OF THE
VICE PRESIDENT
THE HONORABLE GEORGE BUSH

September 2, 1986

Mr.

Dear Mr.          ,

     Our Republican Senate candidates in South Dakota, Nevada, Louisiana, and California are on the verge of running out of money.

     And if these candidates don't receive emergency funding fast, they'll be defeated on November 4th.

     President Reagan and I have discussed this situation, and we're both very concerned.  Because <u>a shift of just 4 seats will give control of the Senate back to the Democrats</u>.

     I regret having to send this urgent letter, but in my political career no letter has ever been more important.

     And because you are one of our Party's most dedicated supporters, I felt I had to write to you myself to ask if you'd please send an immediate contribution of $25 today.

     With the November elections only 63 days away, <u>we don't have a single moment to spare</u>.  For if each of these four candidates don't raise at least $236,500 in the next 21 days -- they'll lose.

     It's that simple -- and that frightening!

     That's why I'm counting on you to rush me your check for $25 by return mail today.

     There is no doubt that 1986 is a pivotal election year.  <u>And for you, myself and President Reagan -- the stakes couldn't be higher</u>.

     You see, on November 4th the American people will decide whether the Republican Leadership in the U.S. Senate is going to continue working "hand-in-hand" with President Reagan guiding our Nation.

     Or whether our adversaries are going to be given the power to pull us off course.

     And if these four candidates end up losing on election day

Page 2

because they ran out of money at this critical "Make or Break" point in their campaigns, then we're almost certainly going to <u>lose President Reagan's precious Republican Majority in the U.S. Senate</u>.

If this happens, you and I will never forgive ourselves if we know in our hearts we hadn't done everything within our power to help these four candidates in this -- their greatest hour of need.

That's why, as Vice President and therefore President of the U.S. Senate, <u>I'm doing everything I can</u> to help each of these four candidates. <u>But I'm only one man</u>. And my efforts alone aren't enough to ensure victory.

The hard reality is this: all four of these fine Republican Senate candidates desperately need your help today.

<u>And your action -- or inaction -- now will quite literally mean political life or death for each of these candidates</u>.

That's why it's absolutely essential that you send in an immediate $25 contribution today.

To expedite the distribution of your contribution, the Republican Presidential Task Force has agreed to serve as the central clearing house.

If you'll write out your $25 check directly to the Task Force, they'll see to it that every penny of your generous contribution is evenly split and immediately delivered to each of these four candidates.

Please, whatever you decide to send, even if it's not $25, I urge you to send it to me without delay.

<u>I'm depending on you</u>           . And depending on a loyal friend like you to help me solve this crisis is good enough for me.

Sincerely,

George Bush

P.S.  I repeat!  Without your immediate financial support, our Republican Senate candidates in South Dakota, Nevada, Louisiana, and California are going to lose.  And we in turn could lose Republican control of the Senate.

That's why I urge you to send an emergency contribution of $25 today.  Thank you!

## REPUBLICAN PRESIDENTIAL TASK FORCE

# EMERGENCY CANDIDATE
# SUPPORT REPLY

URGENT
DEADLINE:
SEPTEMBER 23RD

Dear Vice President Bush,

I understand that our Senate campaigns in South Dakota, Nevada, Louisiana, and California need immediate financial assistance to win this November. To make sure our candidates have the funds they need, I'm enclosing the most generous contribution I can to be split equally among them. Enclosed please find my special candidate check for:

( ) $40      ( ) $25      ( ) $___ Other

Mr.

6J13   00873690

PLEASE MAKE YOUR CHECK PAYABLE TO THE REPUBLICAN PRESIDENTIAL TASK FORCE.

440 FIRST STREET, N.W , SUITE 700 ■ WASHINGTON, D.C 20001
PAID FOR AND AUTHORIZED BY THE NATIONAL REPUBLICAN SENATORIAL COMMITTEE

---

### APPENDIX 2

### MEMORANDUM AND ORDER

#### Filed Nov. 29, 1990

Defendants move to dismiss, alleging two separate grounds for dismissal, and plaintiff the Federal Election Commission (FEC) opposes. The motion has been fully briefed.

First, defendants argue that dismissal is required because, after this Court had remanded in *Common Cause v. FEC*, 729 F.Supp. 148 (D.D.C.1990), the FEC violated 2 U.S.C. § 437g(a)(3) by making a finding of probable cause without providing defendants with (1) advance notice of a probable cause recommendation by its General Counsel and (2) an opportunity to respond.

Section 437g(a)(3) states:

The general counsel of the Commission shall notify the respondent of any recom-

mendation to the Commission by the general counsel to proceed to a vote on probable cause pursuant to paragraph (4)(A)(i). With such notification, the general counsel shall include a brief stating the position of the general counsel on the legal and factual issues of the case. Within 15 days of receipt of such brief, respondent may submit a brief stating the position of such respondent on the legal and factual issues of the case, and replying to the brief of the general counsel. Such briefs shall be filed with the Secretary of the Commission and shall be considered by the Commission before proceeding [to a vote on probable cause by the Commission itself.]

FEC concedes that it did not comply with this provision following remand of *Common Cause v. FEC*. The facts, however,

compel the conclusion that dismissal on this basis is inappropriate.

The FEC General Counsel had already in 1988, as a result of a 1986 complaint filed with the FEC by Common Cause, recommended probable cause on the claims at issue in this case and at that time complied with section 437g(a)(3) by giving defendants notice and opportunity to respond. Thereafter, the FEC, by a 3–3 vote, rejected a probable cause finding on these claims, although it did find probable cause on other claims, which were then resolved by a December 1988 Conciliation Agreement between defendants and FEC. Common Cause then sued in this Court, and the final result was this Court's January 24, 1990, Order holding that FEC's failure to find probable cause on the additional Common Cause charges was contrary to law and remanding to the FEC with instructions to conform with the Court's declaration and proceed within 30 days. 729 F.Supp. at 152–53. On February 5, 1990, the FEC, by a vote of 5–0, found probable cause on the charges at issue. There was no intervening recommendation by the General Counsel or notice to defendants.

However, defendants' claim of a violation of this notice and comment provision was never even raised before the FEC on remand and, notwithstanding defendants' claim to the contrary, is therefore waived. *See, e.g., Brotherhood of Railroad Trainmen v. Chicago, M., St.P. & P.R. Co.,* 380 F.2d 605, 608 (D.C.Cir.), *cert. denied,* 389 U.S. 928, 88 S.Ct. 289, 19 L.Ed.2d 279 (1967). Moreover, defendants already had notice and an opportunity to respond to the additional Common Cause charges in 1988 when the General Counsel initially recommended probable cause, and in fact defendants' position prevailed at that time before the full Commission. Finally, this Court's opinion in *Common Cause* explicitly found that FEC's failure to find probable cause on the additional Common Cause charges was contrary to law; notification or additional briefing prior to a probable cause finding by FEC would likely have served little practical purpose, and defendants have shown no prejudice from the lack thereof.

Second, defendants argue, citing 2 U.S.C. § 437g(a)(4)(A)(i), that the December 1988 Conciliation Agreement bars any further FEC action with respect to claims raised by the 1986 FEC complaint filed by Common Cause. However, the bar to further FEC action required by section 437g(a)(4)(A)(i) applies only to violations settled by the conciliation agreement. *See* H.R.Rep. No. 94–1057, 94th Cong., 2d Sess. 50. The conciliation agreement on its face directly addressed only those charges for which FEC had found probable cause; it did not purport to settle other charges raised by the Common Cause complaint, charges of which defendants were fully aware. The fact that FEC and defendants conciliated certain charges for which FEC *had* found probable cause did not eliminate Common Cause's statutory right, 2 U.S.C. § 437g(a)(8), to seek judicial review of FEC's decision not to find probable cause with respect to other charges.

Accordingly, the Motion to Dismiss is denied, and defendant shall answer the Complaint by December 14, 1990.

Counsel for FEC indicated at a status conference on November 8, 1990, that FEC intended to file a motion for summary judgment. Any such motion shall be filed by December 21, 1990. Defendants shall file any response and any cross-motion by January 15, 1991, and further briefs shall be filed in accordance with Local Rule 108.

SO ORDERED.

      (s) Gerhard A. Gesell
      United States District Judge

November 29, 1990.